IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

PAMELA L. MITCHELL,

    **Plaintiff,**

                                        **Civil Action 2:19-cv-4973**

    **v.**                                  **Judge James L. Graham**

                                        **Magistrate Judge Chelsey M. Vascura**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

**<u>REPORT AND RECOMMENDATION</u>**

Pamela L. Mitchell ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income.  This matter is before the undersigned for a Report and Recommendation ("R&R") on Plaintiff's Statement of Errors (ECF No. 9), the Commissioner's Memorandum in Opposition (ECF No. 11), Plaintiff's Reply (ECF No. 12), and the administrative record (ECF No. 8).  For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

### I.        PROCEDURAL HISTORY

Plaintiff protectively filed her application on April 28, 2014, alleging that she became disabled that same day.  (R. at 264.)  Plaintiff's application was denied initially on July 31, 2014, and upon reconsideration on November 14, 2014.  (R. at 121, 138.)  A hearing was held on October 6, 2016, before an Administrative Law Judge ("ALJ"), who issued an unfavorable determination on January 6, 2017.  (R. at 80–107, 139–54.)  After Plaintiff appealed the ALJ's determination, the Appeals Council remanded the case back to the ALJ.  (R. at 155–60.)  Upon

remand, the ALJ presided over a hearing on July 5, 2018 (R. at 44–79), and a supplemental hearing on October 6, 2018 (R. at 80–107).  The ALJ subsequently issued a second unfavorable determination on August 1, 2018.  (R. at 12–43.)  The Appeals Council declined to review that second unfavorable determination, and thus, it became final.  (R. at 1–6.)  Plaintiff seeks judicial review of that second unfavorable determination.

In this action, Plaintiff alleges that the ALJ committed reversible error when she assessed Plaintiff's residual functional capacity ("RFC").[1]  Specifically, Plaintiff contends that the ALJ erred by failing to explain why she did not incorporate into Plaintiff's RFC a restriction that Plaintiff was limited to following one-step directions as opined by state agency reviewing psychologists Karen Steiger, Ph.D. and Janet Souder, Psy.D.  (Pl.'s Statement of Errors, ECF No. 9; Pl's. Reply, ECF No. 12.)  Plaintiff also alleges that the ALJ erred by relying upon testimony from a Vocational Expert ("VE") who testified at the July 5, 2018, hearing instead of relying upon testimony from a VE that testified at the supplemental hearing on October 6, 2018.

## II.      THE ALJ's DECISION

On August 1, 2018, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 12–43.)  At step one of the sequential

---

[1] A claimant's RFC is an assessment of "the most [she] can still do despite her limitations."  20 C.F.R. § 4040.1545(a)(1).

evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since the alleged date of onset, April 28, 201.  (R. at 19.)  At step two, the ALJ found that Plaintiff had the following severe mental impairments: [3] depressive, intellectual, anxiety, and neurodevelopmental disorders.  (*Id.*)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.)

At step four, the ALJ set forth Plaintiff's mental RFC as follows:

Mentally, the claimant retains the capacity to perform simple routine tasks with few detailed instructions and where changes are introduced slowly and well explained. She is limited to understanding simple oral instructions, and all instructions must be given orally.  She is limited to work with no more than occasional changes in

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

[3] Plaintiff's allegations of error pertain only to her mental health impairments and restrictions. Accordingly, the undersigned's discussion is limited to those issues.

work setting and decision making required.  She is limited to goal based work measured by end result, with no production rate pace work, high or strict production quotas, and piece rate work.

(R. at 29.)

When assessing this RFC, the ALJ considered the record evidence, including medical opinion evidence.  (*Id.* 31–36.)  The ALJ assigned "partial weight" to the opinions of state agency reviewing psychologists, Drs. Steiger and Souder.  (*Id.* at 33.)  At step five of the sequential process, the ALJ noted that Plaintiff did not have past relevant work.  (*Id.* at 36.)  In addition, relying on testimony from the VE who testified at the July 5, 2018 hearing, the ALJ found that given Plaintiff's age, education, work experience, and RFC, there were jobs in the national economy that Plaintiff could perform including, for example, flumer, laundry worker, and car washer.  (*Id.* at 37, 74–75.)  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act.  (*Id.* at 38.)

### III.    RELEVANT RECORD EVIDENCE

#### A.    Plaintiff's Testimony

At the hearing on July 5, 2018, Plaintiff testified that her mental health issues prevented her from working because she had problems staying on task and that she sometimes failed to complete tasks because she would daydream or do something else.  (R. at 56.)  Plaintiff testified that she was taking depression medication and that she received treatment from counselors at Scioto Paint Valley for mental health issues.  (R. at 56.)  Plaintiff kept track of her medications by using a pill box.  (R. at 59–60.)  She took her medications as prescribed except that she would forget to do so every once in a while. (R. at 60.)

Plaintiff indicated that her depression caused her to not want to get up and do things and that it would make her sit and cry a lot and that she "got sick" from her depression.  (R. at 57.)

She testified that for the past couple weeks she would wait until her kids were asleep and then cry nightly when she went to bed.  (R. at 58.)  She stated that had experienced depression since her father passed away eight years ago.  (*Id*.)  Plaintiff also stated that she was having problems going outside at night and that she was afraid to ride in vehicles.  (*Id*.)

On a typical day, Plaintiff would wake up around seven in the morning, go to the bathroom, take her medicine when she remembered, eat, and then do laundry or dishes with her two daughters who lived with her.  (R. at 68-69.)  In the afternoon and evenings, she would sit and watch television and listen to music.  (R. at 70.)  Sometimes she would play board games.  (*Id*.)  Plaintiff also played Disney and other children's games with her eight-year old granddaughter and listened to music on a laptop computer at home.  (R. at 65, 66.)  Plaintiff never took care of her granddaughter by herself.  (R. at 69.)  Plaintiff had a Facebook account but she did not use it often because it made her eyes hurt.  (R. at 66.)  She had "a bunch" of friends on Facebook, and she would share information on Facebook twice a day. (R. at 66.)

Plaintiff's husband took care of money management when they were together, but the bank currently did that for her.  (R. at 62.)  A case manager also used to help Plaintiff by taking her to doctor appointments, the store, and the bank, but the case manager had retired and a new one had not been hired.  (*Id*.)  Plaintiff's eldest daughter had taken over calendaring doctor appointments.  (R. at 63.)  Plaintiff paid gas, electric, rent, and cable bills on time but would sometimes forget and pay late.  (R. at 71.)

Plaintiff shopped for groceries once a week at a store located approximately four or five blocks away from her home that she travelled to via bus or rides from friends. (R. at 63-64.)  Her daughters made grocery lists for her.  (R. at 64.)  Plaintiff had failed her driving test twice and did not have a driving license.  (R. at 67.)  Plaintiff indicated that she could read children's books

and novels with help but that she would have to read things over again.  (R. at 49.)  Plaintiff took

online classes for a year in early childhood education or teacher assistance from Stratford

University but did not go farther because it was hard.  (R. at 52.)

At the hearing on October 6, 2018, Plaintiff testified that she had trouble reading or

watching television but that she needed to re-read or re-watch things in order to understand them.

(R. at 87–88.)  Plaintiff also indicated that she had trouble completing tasks like cleaning,

laundry, and dishes and that she had been forgetting to take her medicines and go to doctor

appointments.  (R. at 89.)  Plaintiff indicated that a service provider at Scioto Paint Valley had

acted like a caretaker and that she had taken Plaintiff to doctor appointments, attended them with

Plaintiff, and kept track of information from those appointments that needed to be provided to

other agencies.  (R. at 89–90.)  She had also helped Plaintiff pay bills.  (R. at 90.)  Plaintiff

testified that her depression made her "real bad sick" and that she would get upset and throw up.

(R. at 93.)  Plaintiff testified that she would get stressed about bills, her inability to do things that

she used to do, and her daughter who had Downs syndrome.  (R. at 93–94.)  Plaintiff had

problems cooking.  (R. at 98.)  Her two daughters, including her daughter with Downs syndrome,

and her granddaughter helped her a lot.  (R. at 99.)

### B.     Records from Scioto Paint Valley Mental Health Center

The record reflects that Plaintiff received assistance from Scioto Paint Valley Mental

Health Center since at least December 4, 2013.  (R. at 431.)  An assessment done by a social

worker on that date indicated that Plaintiff had recurring depression, generalized anxiety, and

borderline intellectual functioning.  (R. at 437.)  Plaintiff reported that she separated from her

husband after he abused their eldest daughter and that she had finance, housing, and family

problems and that although she tried to maintain a positive attitude, chaos at home made it

6

difficult to do so. (R. at 431.) Plaintiff reported that her activities were limited due to open heart surgery but that she watched movies, listened to music, collected angels and stuffed animals, and that she enjoyed shopping, going for walks, doing things with others including her granddaughter and best friend, and that she took care of herself, got along with others, was caring and giving, and did not let things bother her. (R. at 431, 435.) A mental status examination revealed that Plaintiff's thought processes were circumstantial, tangential, racing, and that she had flights of ideas; she experienced visual and olfactory hallucinations; her attention and concentration and ability to abstract were impaired; and her intelligence was estimated as borderline. (R. at 438.) Although Plaintiff's affect was full, her mood was depressed and anxious. (*Id.*) Counseling and community psychiatric support were recommended as well as crises services if needed. (R. at 436.) An individual service plan indicated that Plaintiff's goals were to gain control over her emotional/behavioral symptoms so that they would not significantly interfere with her life and to make a better life for her and her daughters. (R. 626.)

Notes from December 2013 through May 2015 indicate that Plaintiff met regularly with a qualified mental health specialist ("QMHS") who helped Plaintiff access community support services (R. at 466, 465, 464, 461, 460, 459, 456, 453, 452, 451, 448, 447, 446, 443, 441, 549, 543, 531, 519, 525, 519, 628, 616) and assisted her with her application for SSI benefits including reminding Plaintiff to inform her attorney that she had been working (R. at 465, 462, 461, 460, 457, 454, 451, 449, 448, 447, 446, 441, 545, 543, 533, 531, 527, 519, 618). At appointments, Plaintiff also discussed employment issues and opportunities and that transportation and obtaining care for her disabled adult daughter while she was working constituted employment barriers. (R. at 456, 453, 443.) At several appointments, the QMHS wrote that Plaintiff was easily distracted (R. at 527, 525, 523) or hard to keep on task (R. 448,

521) when filling out forms or interacting with other potential service providers.  Other appointment notes indicate that it was observed or reported that Plaintiff had difficulty staying on topic or concentrating or that she was distracted or distractable.  (R. 447, 618, 617, 615, 613.)  In addition, Plaintiff was upset and stressed, nervous, and anxious at several appointments because her eldest daughter allowed her boyfriend to stay at the family home for extended periods (R. at 455, 454, 446, 445, 444), stressed and concerned at another appointment because her daughter was scheduled for medical testing (R. at 537), anxious about a surprise housing inspection (R. at 616), stressed when several family members were home sick or about family issues (R. at 615, 612), and just anxious (R. at 613).   Nevertheless, the notes routinely indicate that Plaintiff's mood was "ok" (R. at 461, 454, 442, 551, 545, 543, 541, 531, 527, 521, 519, 628, 619, 618, 614, 611 ) or "good" (R. at 466, 465, 464, 462, 460, 456, 453, 452, 451, 443, 441, 440, 551, 549, 547, 539, 535, 533, 529, 525, 613) and that she was appreciative of (R. at 466, 464, 460, 549, 547, 537, 531, 529, 527, 615, 614, 611) or receptive to (R. at 465, 462, 456, 455, 454, 453, 452, 451, 447, 446, 444, 442, 551, 545, 543, 541, 539, 533, 523, 521, 519, 628, 619, 618, 617, 613, 611, 610) the support she received at appointments.

Plaintiff returned to Scioto Paint Valley Mental Health Center in March 2016, and met with an LPC at that time.  (R. at 605.)  In treatment notes and individual service plans from March and April 2016, the LPC wrote that with regard to mood, Plaintiff was alert and oriented, maintained appropriate eye contact, displayed appropriate affect, and that she stated that she was doing "alright."  (R. at 605, 604.)  Plaintiff reported that she was stressed about a conflict with a neighbor and frustrated that her husband continued to visit and associate with their eldest daughter, with whom Plaintiff continued to have conflict.  (R. at 605.)  Plaintiff reported that she only had "me time" to take care of herself after others were asleep but that she enjoyed walking

to stores and the library, going to church, and visiting with family and friends. (*Id.*) Plaintiff also reported that spent time with her granddaughter, read, and listed to music to address feeling depressed and stressed. (*Id.*) Plaintiff expressed a desire to pursue vocational opportunities that would allow her to bring her disabled daughter with her such as early childhood education. (*Id.*)

During a June 4, 2016 individual service plan review, Plaintiff agreed to see a psychiatrist for an initial evaluation, meet with a psychiatric nurse as necessary, and to practice medication compliance by maintaining and keeping her appointments. (R. at 600, 599, 680–81.) During that same review, Plaintiff stated that she wanted to continue going to counseling because it helped her with her goals. (*Id.*) Plaintiff missed two subsequent appointments that month because she was feeling unwell on June 7, 2016, and because her daughter's step-grandfather had serious medical issues on June 13, 2016. (R. at 594.)

Another assessment was done by the LPC on November 22, 2016. It again indicated that Plaintiff had recurring depression, generalized anxiety, and borderline intellectual functioning. (R. at 642.) At that time, Plaintiff reported that she had completed the 12th grade and was taking on-line classes through Stratford University. (R. at 639.) Plaintiff also reported that her learning style was "[h]ands-on" and that she liked to "read the instructions and stuff." (*Id.*) Plaintiff indicated that she experienced limitations because of her physical issues, including pain in her hips, legs, back, and chest, and that she was fatigued easily especially since recovering from a heart attack. (R. at 629, 642.) Plaintiff stated that she felt nervous, anxious, frightened, worried, or on edge all the time; she experienced anxiety all her life; and noticed that her depression worsened when she was stressed. (R. at 642.) Plaintiff coped with such feelings by reading, watching movies, and listening to music. (*Id.*) She also went for walks when she could, hung out at the library with her girls, attended ballet classes and school programs with her

granddaughter, went to the park, spent time with her girls and animals, walked her dog when she could, and made things with her granddaughter at home.  (R. at 638.)  Plaintiff's lawyer told her that she had a lot of problems when she was in school.  (R. at 642.)  A mental status examination revealed that that Plaintiff's thought processes were circumstantial, tangential, racing, and that she had flights of ideas; her attention and concentration and ability to abstract were impaired; and her intelligence was estimated as borderline.  (R. at 643.)  Although Plaintiff's affect was full, her mood was depressed and anxious.  (*Id*.)  A cross-cutting symptom measurement instrument indicated that Plaintiff had not experienced any problems with memory (e.g., learning new information) or location (e.g., finding your way home) during the previous two weeks.  (R. at 646.)  Counseling, community psychiatric support, and as-needed crisis services were recommended, and information about other psychiatric support was offered.  (R. at 640.)

At individualized service plan reviews performed on November 22, 2016, December 2, 2016, and June 1, 2017, Plaintiff indicated that her goals were to keep receiving the same services that she was already receiving, trying to get into programs to keep her busy, help other people, and look for a better future. (R. at 675.)

On June 30, 2017, the LPN wrote that Plaintiff conveyed a pleasant mood and congruent affect; her speech was clear and coherent; her behavior was interactive; and she was alert and oriented.  (R. at 654.)  Plaintiff's attention and concentration was also intact.  (*Id*.)  Plaintiff failed to attend an appointment on July 12, 2017.  (R. at 656.)

On August 24, 2017, Plaintiff described her mood as "not real good" but "not real bad," and reported that she was stressed about where she lived.  (R. at 658.)  The LPN wrote that Plaintiff's eye contact was good, her speech was clear and coherent, her demeanor was comfortable, and she was alert and oriented.  (R. at 658.)  Her attention and concentration,

however, was somewhat impaired that day.  (*Id*.)  On October 5, 2017, Plaintiff's mood was euthymic, her affect was full, her speech was coherent, and her thought processes were mostly goal-oriented although tangential at times.  (R. at 660.)  Plaintiff was also cooperative, alert, and oriented.  (*Id*.)  The LPN encouraged Plaintiff to reach out to her primary care physician about medications and explained that medication management services could not be provided until Plaintiff attended four scheduled appointments.  (*Id*.)  On October 12, 2017, Plaintiff indicated that her mood was "off and on" and that she "got moody;" she was stressed again about where she lived; and she was lacking energy.  (R. at 663.)  Plaintiff failed to attend, however, an appointment on October 17, 2017.  (R. at 666.)

On October 30, 2017, the LPN wrote that Plaintiff reported that she was good and that her affect was congruent.  (R. at 670.)  Plaintiff's speech was clear and coherent, her demeanor was polite and cooperative, she was alert and oriented, and her thought processes were mostly goal-oriented although circumstantial at times.  (*Id*.)  Plaintiff's attention and cooperation were also intact.  (*Id*.)  Plaintiff did not attend an appointment on November 7, 2017.  (R. at 673.)

On February 28, 2018, Plaintiff reported that she had "off and on" stress but that she was "pretty good" and had been able to "go do stuff" that she had wanted to do.  (R. at 686.)  Plaintiff reported that she was still "fighting SSI" and was scheduled to see a judge soon, she was seeing a new doctor, and taking her medications.  (*Id*.)  The notes also indicate that Plaintiff's care was transferred from the LPN to another service provider at Scioto Paint Valley Mental Health Center who made at least two unsuccessful attempts to contact Plaintiff about continuing her services there.  (R. at 688, 697.)

C.      **Relevant Records from Donald Fouts, D.O.**[4]

Plaintiff sought treatment from Donald Fouts, D.O. from January 29, 2014, until March

31, 2016.  Although Plaintiff sought treatment for her physical ailments from Dr. Fouts, notes

indicate that his examinations during this period included a psychological assessment and that

those examinations revealed that Plaintiff was alert and cooperative, she had normal mood and

affect, and that her attention span and concentration were normal.  (R. at 502, 493, 487, 481, 579,

572, 566, 559.)

D.      **Medical Opinions**

1.      **Consultative Examiner Marc W. Miller, PhD.**

On July 28, 2014, consultative examiner Marc W. Miller, PhD., examined Plaintiff.  (R.

at 474–785.)  Dr. Miller wrote that Plaintiff's appearance and grooming was average, her

hygiene was fair, and that Plaintiff was cooperative, friendly, and mannerly.  (*Id*. at 476.)

Plaintiff smiled frequently and was, at times, somewhat silly.  (*Id*. at 476.)  Dr. Miller also noted

Plaintiff's immaturity.  (*Id*.)  Although she was anxious throughout the interview, he noted no

impulsivity or animated or pain behaviors.  (*Id*.)  Plaintiff's eye contact was good, and her

psychomotor response was normal.  (*Id.*)  Plaintiff's speech was fast, and she tended to ramble

and needed to be redirected, but her speech was intelligible, receptive skills were good, and she

initiated conversations frequently.  (*Id*.)  Although Plaintiff related issues with depression and

low libido, her energy levels were fair, her mirth response was good, and she had no suicidal

thoughts, tearfulness or crying.  (*Id*.)  With regard to anxiety, Plaintiff had issues with her mind

racing, excessive worry, nightmares, nail biting, and irritability, but no teeth grinding or panic

---

[4] Because Plaintiff raises claims that pertain only to her mental health impairments and
restrictions, the undersigned's summary of Dr. Fouts' records is limited to those issues.

attacks.  (*Id*.)  Plaintiff was alert and oriented times 4 at a basic level, she could recall 3 out of 3 items in a period of five minutes, and she knew her birthdate, age, and address.  (*Id*.)  Although she had difficulty supplying details about her biographical information, her memory appeared to be adequate for someone with low intellectual capabilities.  (*Id*.)  Her organizational skills were good; her problem-solving skills were moderate; and her concentration was fair to poor.  (*Id*.)  Plaintiff had difficulty with abstract thinking.  (*Id*. at 477.)  She could follow one-step directions and operate a computer at a basic level but she could not multi-task or read a newspaper.  (*Id*.)  Dr. Miller estimated that Plaintiff's intellect was in the borderline range.  (*Id*.)  Plaintiff had no suspiciousness or mistrust, no auditory or visual hallucinations, and no obsessions/compulsions.  (*Id*.)  She had poor coping skills and difficulty with insight but her social adaptation was good and she got along with others.  (*Id*.)  Plaintiff had no hobbies and stayed home but she attended church regularly, watched television, prepared meals for herself, her daughter with downs syndrome, and her granddaughter, and did laundry, cleaning, and dishes.  (*Id*.)  She would shop with her daughter and granddaughter and managed her money with help from her caseworker.  (*Id*.)

Dr. Miller opined that Plaintiff had difficulty dealing with stress and pressure in a work environment.  (*Id*. at 478.)  In addition, Dr. Miller opined that Plaintiff had some difficulty understanding, remembering, and carrying out instructions.  (*Id*. at 477.)  Dr. Miller also opined that Plaintiff had some difficulties with regard to maintaining attention span and concentration, and that this could be due to Plaintiff's anxiety issues.  (*Id*. at 478.)  He further opined, however, that Plaintiff had no difficulty interacting with coworkers, supervisors, and the public, and noted that Plaintiff was very friendly and enjoyed social interaction.  (*Id*.)

### 2. State Agency Reviewers Drs. Steiger and Souder

On August 1, 2014, state agency reviewing physician Dr. Steiger reviewed Plaintiff's file. (R. at 116–18.)  Dr. Steiger opined that due to Plaintiff's understanding and memory limitations, Plaintiff was moderately limited with regard to her ability to understand and remember detailed instructions.  (R. at 117.)  Dr. Steiger also opined that due to Plaintiff's adaptation limitations, she was moderately limited with regard to her ability to respond appropriately to changes in the work setting.  (R. at 118.)  In addition, Dr. Steiger opined that due to her sustained concentration and persistence limitations, Plaintiff was moderately limited with regard to her ability to carry out detailed instructions; maintain attention and concentration for extended periods; make simple work-related decisions; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. at 117.)  Dr. Steiger elaborated on Plaintiff's concentration and persistence capacities and limitations in the narrative discussion section[5] of the form that she used to record her assessment:

> Last FSIQ was 59; it is estimated that she is functioning in the borderline range of intelligence.  She knew her age, DOB, address.  Memory was adequate for low intellectual abilities.  Concentration was fair to poor. Moderate problem solving and good organizational abilities.  She was able to spell world in reverse w/ no errors.  She was able to respond to 1 of 2 proverbs.  She was not able to compare like items.  *She is able to follow one-step directions but was unable to multi-task.*

(*Id*.) (emphasis added).  Dr. Steiger wrote in the "additional explanation text box" of the form: "[Plaintiff] would be able to perform SRTs in a slow paced work environment.  She should not be expected to perform effectively under stress."  (R. at 118.)

---

[5] The form used by Dr. Steiger explicitly indicates that the RFC assessment appears in that narrative discussion section and that any other assessment information deemed appropriate should appear in the additional explanation text box.  (R. at 116.)

On August 1, 2014, state agency reviewer Dr. Souder reviewed Plaintiff's file.  (R. at 132–35.)  Dr. Souder opined the same limitations as Dr. Steiger, including that "[Plaintiff] would be able to perform SRTs in a slow paced work environment.  She should not be expected to perform effectively under stress."  (R. at 135.)  Unlike Dr. Steiger, however, Dr. Souder opined that Plaintiff also had social interaction limitations, although she was not significantly limited with regard to any aspects of that domain.  (R. 118, 134.)

## IV.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "take 'into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"

*Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## V.    ANALYSIS

As noted, Plaintiff raises two allegations of error.  First, Plaintiff contends that the ALJ committed reversible error by failing to adequately explain why she did not incorporate into Plaintiff's RFC a one-step direction limitation opined by state agency reviewers Drs. Steiger and Souder.  Plaintiff next contends that the ALJ erred when she relied on testimony from one VE instead of another VE at step five of the disability analysis.  (Pl.'s Statement of Errors, ECF No. 9; Pl's. Reply, ECF No. 12.)  These contentions are discussed in turn.

### A.    The ALJ Did Not Err By Failing to Explain Why a One-Step Direction Limitation Was Not Incorporated Into Plaintiff's RFC.

Plaintiff alleges that the ALJ failed to adequately explain why she did not incorporate into Plaintiff's RFC a one-step direction limitation opined by Drs. Steiger and Souder given that the ALJ assigned their opinions partial weight.  (Pl.'s Statement of Errors, ECF No. 9; Pl's. Reply, ECF No. 12.)  The undersigned does not find that the ALJ's discussion warrants remand.

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations."  20 C.F.R. § 416.945(a)(1).  An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence.  20 C.F.R. § 416.929(a).  Although an ALJ must consider and weigh medical opinions, the RFC

determination is expressly reserved to the Commissioner.  *Ford v. Comm'r of Soc. Sec.,* 114 F. App'x. 194, 198 (6th Cir. 2004).

 "Under the regulations, ALJs 'must consider findings of [s]tate agency medical and psychological consultants,' but ALJs 'are not bound by any findings made by [s]tate agency medical or psychological consultants.'"  *Renfro v. Barnhart,* 30 F. App'x. 431, 436 (6th Cir. 2002) (quoting 20 C.F.R. § 404.1527(f)(2)(i)).[6]  "[T]he opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight."  *Douglas v. Comm'r of Soc. Sec.,* 832 F.Supp. 2d 813, 823–24 (S.D. Ohio 2011).  This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.;* 20 C.F.R § 416.927(d),(f).[7]  "Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization."  *Douglas,* 832 F.Supp. 2d at 823–24.  Nevertheless, "there is no legal requirement for an ALJ to explain each limitation or restriction he [or she] adopts or, conversely, does not adopt from a non-examining physician's opinion, even when it is given significant weight."  *Price v. Comm'r of Soc. Sec.*, 2:18-cv-128, 2019 WL 396415, at *2 (S.D. Ohio Jan. 31, 2019) (quoting *Smith v. Comm'r of Soc. Sec.*, No. 5:11-cv-2104, 2013 WL 1150133, at *11 (N.D. Ohio March 19, 2013) (citing *Ford*, 114 F. App'x. at 198.))

---

[6] Section 404 .1527 applies to claims, like Plaintiff's, that were filed on or before March 17, 2017.

[7] Section 416.927 applies to claims, like Plaintiff's, that were filed on or before March 27, 2017.

Plaintiff specifically contends that the ALJ discredited the opinions from state agency reviewers Drs. Steiger and Souder only because they were not stated in vocationally relevant terms. (Pl's Statement of Errors, ECF No. 9, at PAGE ID # 753; Pl's Reply, ECF No. 12, at PAGE ID # 773.) Thus, Plaintiff reasons, the ALJ deemed all their opined limitations substantively credible and it was error for the ALJ to omit any of them from Plaintiff's RFC, including the one-step direction limitation that they had opined, without additional explanation. (*Id*.) The undersigned is not convinced, however, that the ALJ discredited Drs. Steiger's Souder's opinions only because they were not stated in vocationally relevant terms or that she deemed all their opined limitations substantively credible. (Pl's Statement of Errors, ECF No. 9, at PAGE ID # 753; Pl's Reply, ECF No. 12, at PAGE ID # 773.) Instead, the undersigned concludes that the weight that the ALJ assigned to these opinions was based on their consistency with the record evidence.

Specifically, at step three, the ALJ determined that Plaintiff's mental impairments did not meet or medically equal a Listing. (R. at 21.) In making that determination, the ALJ considered the paragraph B criteria— whether Plaintiff's mental impairments or combination of the same resulted in an extreme limitation in one or a marked limitation in at least two of several domains including concentrating, persisting, or maintaining pace. (*Id*.) The ALJ also explicitly concluded that Drs. Souder's and Steiger's opinions were inconsistent with the record evidence in that they opined greater limitations in that domain than generally evinced by the record. (R. at 26.) The ALJ explained:

> [Drs. Steiger and Souder] opined that Plaintiff has moderate difficulties with regard to maintaining concentration, persistence, and pace . . . . These opinions are inconsistent with the totality of the evidence, as discussed above, which documents little or no limitations in concentrating, persisting, or maintaining pace. In light of claimant's education, childhood IQ scores, enrollment in on-line college classes, presentation at different times, admitted and demonstrated abilities for *following*

> *one-step and written instructions*, handling changes in routine, thoroughness, taking directions, and eagerness for learning new skills, and activities involving significant concentrating, persisting, or maintaining pace, as discussed above, the evidence could support a determination that she has no or only mild limitations in concentrating, persisting, or maintaining pace.  However, in extending the benefit of all reasonable doubt and in light of the claimant's adult IQ scores, the BDD assessments are entitled to significant weight in concentrating, persisting, or maintaining pace.  Accordingly, it is determined that the claimant has moderate rather than no or only mild limitations in concentrating, persisting, and pace.

(*Id.*) (emphasis added).  In short, the ALJ explained that Drs. Steiger's and Souder's opinions about Plaintiff's moderate limitations in concentration, persistence, and pace limitations were inconsistent with the record evidence but that she tipped the balance in Plaintiff's favor given Plaintiff's adult IQ scores and nevertheless concluded that she was moderately limited in this area.

Contrary to Plaintiff's contentions, the ALJ also did not indicate that she discounted Drs. Steiger's and Souder's opinions only because they were not stated in vocationally relevant terms.  Rather, the ALJ indicated that she restated certain limitations opined by Drs. Steiger and Souder in more vocationally relevant terms and then credited their opinions to the extent that they were consistent with the record.  (R. at 33.)  The ALJ also explicitly referenced her discussion of the paragraph B criteria at step three and again noted that the record evidence could support a finding that Plaintiff was less limited than opined by Drs. Steiger and Souder.  (*Id.*)  The ALJ wrote:

> Although restatements were made into vocationally more relevant terms, the opinions of [Drs. Steiger and Souder] are entitled to partial weight in assessing the claimant's mental functional limitations and restrictions as of the application date . . . .  The claimant's limitations to performing simple routine tasks with no more that occasional changes in work setting and decision making required and few detailed instructions where changes are introduced slowly and well explained, accommodate [Drs. Steiger's and Souder's] assessments that she is limited to performing simple routine *one- and two-step directions* with occasional changes fully explained and is incapable of multitasking . . . .  These opinions are consistent with the totality of the evidence, including the "paragraph B" criteria, as discussed

19

above, which documents no more than moderate limitations in . . . concentrating, persisting, or maintaining pace . . . . and could support determinations that the claimant is less limited in these areas.  These opinions are consistent with the claimant's education, childhood IQ scores, enrollment in online college classes, admitted and demonstrated abilities for *following one-step and written instructions* . . . . handling changes in routine, thoroughness, taking directions, and eagerness for learning new skills . . . presentation at different times, activities involving . . . concentrating, persisting, or maintaining pace . . . .  This evidence does not reasonably justify greater reduction of the claimant' mental residual functional capacity, and could support a determination that she is less mentally limited than set forth above as of the application date.  However, in extending the benefit of the doubt and in light of the claimant's adult IQ scores, it is determined that she is limited to only simple oral instructions in the workplace.  These opinions are not credibly contradicted, as no acceptable medial source within the meaning of the Regulations credibly opined as to the existence of additional or greater mental functional limitations and restrictions as of the application date . . .  Accordingly, [Drs. Steiger's and Souder's] mental residual functional capacity assessments are each overall entitled to partial weight in assessing the claimant's mental functional limitations and restrictions as of the application date.

(*Id*.) (emphasis added).  In short, ALJ did not discount the opinions because they had not been stated in vocationally relevant terms.  Rather, she credited the opined limitations that were consistent with the record while noting that the record could also support a finding that Plaintiff was perhaps not as limited as these experts had opined.  This discussion sufficiently described the ALJ's analysis of Drs. Steiger and Souder's opinions.

Plaintiff notes that the ALJ included in Plaintiff's RFC a limitation to performing "simple routine tasks with few detailed instructions where changes are introduced slowly and well explained," and that she indicated that she did so in order to "accommodate [Drs. Steiger's and Souder's] assessments that she is limited to performing simple routine *one- and two-step directions* with occasional changes fully explained and is incapable of multitasking."  (Pl's Statement of Errors, ECF No. 9, at PAGE ID # 753; R. at 29, 33.)  Plaintiff correctly notes that Drs. Steiger and Souder did not, however, opine that Plaintiff was able to follow two-step directions, and that they instead opined that she was capable of following one-step directions.

20

(Pl's Statement of Errors, ECF No. 9, at PAGE ID # 753.) But when crafting Plaintiff' RFC, the ALJ did not determine that Plaintiff was capable of following two-step directions. Indeed, the ALJ did not even determine that Plaintiff was capable of following one-step directions. Rather, the ALJ concluded that Plaintiff could perform simple routine tasks with few detailed instructions. That conclusion is supported by substantial evidence given that both Drs. Steigler and Souder also opined that Plaintiff was capable of performing simple routine tasks. (R. at 118, 135.) The ALJ was not required to adopt verbatim every limitation that Drs. Steigler and Souder opined even if their opinions were given partial weight. *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x. 267, 275 (6th Cir. 2015) (ALJ was not required to incorporate consulting physician's balancing, avoidance of hazards and vibration, and left arm feeling limitations into RFC even though ALJ gave great weight to that physician's opinions where those restriction were not supported by the record).

Moreover, other substantial record evidence supports the ALJ's determination that Plaintiff was not as impaired with regard to concentration, persistence, and pace limitations as these experts had opined. For example, the record reflects that Plaintiff engaged in activities that required concentration, including watching movies (R. at 431, 642) and reading (R. 605, 642). The record also reflects that Plaintiff took on-line classes through Stratford University for at least one year. (R. at 639, 52.) Plaintiff also reported that she liked written instructions. (R. at 639.) The record also indicates that Plaintiff told her mental health service providers that her limitations and disabilities were due to her physical impairments (R. at 431, 629, 642) and that she identified lack of transportation and day care for her adult disabled daughter as her other barriers to employment (R. at 456, 453, 443). The records also contain numerous treatment

notes indicating that Plaintiff's attention and concentration were intact. (R. at 654, 670, 502, 493, 487, 481, 579, 572, 566, 559.)

Plaintiff additionally asserts that because the ALJ inaccurately stated that Drs. Steiger and Souder opined that she was capable of following two-step directions, the ALJ must have misread their opinions. The undersigned notes, however, that the ALJ indicated at least six times in her written determination that Plaintiff demonstrated the ability to follow one-step directions. (R. at 22, 23, 25, 26, 33, 35.) In so doing, she cited the opinion from consultative examiner Dr. Miller finding that Plaintiff was capable of following one-step directions, which had been reviewed by Drs. Steiger and Souder. (R. at 22, 25.) Thus, the undersigned is not convinced that the ALJ misunderstood the opinions. Instead, the undersigned finds that the ALJ considered all the opined limitations, restated them in generally more vocationally relevant terms, and then adopted the limitations that she deemed credible in light of their consistency with the record evidence. That consideration was appropriate. *Douglas,* 832 F.Supp. 2d at 823–24 (explaining that consistency is one of the factors used to weigh opinions from reviewing physicians).

For all these reasons, the undersigned concludes that this assignment of error does not warrant remand.

### B. VE Testimony

Plaintiff also alleges that the ALJ committed reversible error because she relied upon testimony from the VE who testified at the July 5, 2018 hearing instead of testimony from the VE who testified at the October 6, 2018 hearing. (Pl's Statement of Errors, ECF No. 9, at PAGE ID # 755.) Specifically, at the July 5, 2018 hearing, Plaintiff's counsel asked the VE if someone with the same age, education, background, work experience, and RFC as Plaintiff but with an IQ score of 59 was employable. (R. at 76, 77.) The VE at that hearing testified that she was not

qualified to interpret IQ scores. (R. at 76.) Similarly, at the October 6, 2018 hearing, Plaintiff's counsel asked the VE who testified then if someone with Plaintiff's profile but with an IQ in the upper 60s was likely to be successfully employed. (R. at 106.) The VE at that October 6, 2018 hearing testified that in his experience, there would need to be some kind of accommodation. (*Id.*) At step five of the disability analysis, the ALJ concluded that the opinion from the VE who testified at the earlier July 5, 2018 hearing was entitled to significant weight and she relied on that opinion to find that there were significant jobs in the national economy that Plaintiff could perform. (R at 38.) The ALJ also concluded that the testimony from the VE who testified at the later October 6, 2018 hearing was entitled to no weight because "the regulations, DOT, and SCO do not provide that IQ scores comparable to or the same as [Plaintiff's] automatically result in any specific functional limitations and restrictions, including to accommodated rather than competitive work." (R. at 38.) Plaintiff asserts that the ALJ erred and that she should have relied upon the testimony from the VE who testified at the later October 6, 2018 hearing.

A vocational expert testifies on the basis of a claimant's "residual functional capacity and . . . age, education, and work experience" and assesses whether the claimant "can make an adjustment to other work." 20 C.F.R. § 416.920(a)(4)(v). The vocational expert's testimony is directed solely to whether, given a claimant's age, experience, and education, along with the ALJ's assessment of what she "can and cannot do," there exist a significant number of employment opportunities for her in the regional and national economies. The vocational expert is not expected to evaluate the claimant's medical conditions in making this determination. Indeed, vocational experts are not required to have any medical training, so any evaluation of medical evidence they perform would be outside their area of expertise.

An ALJ may rely on a VE's response to a hypothetical question only if the question accurately portrays a claimant's physical and mental impairments. *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 516 (6th Cir. 2010). The ALJ is required to incorporate only those limitations that she has deemed credible. *Casey v. Sec'y of Health & Human Servs.,* 987 F.2d 1230, 1235 (6th Cir.1993). In this case, the ALJ discussed Plaintiff's IQ scores at step two of the disability analysis and explicitly described why the record demonstrated that Plaintiff's functional abilities were more robust than her adult IQ scores might indicate. (R. at 22.) The ALJ noted that even though Plaintiff's IQ adult score was 59, her childhood IQ score was over 70, she attended classes through 12th grade, she indicated that she enjoyed following written instructions, and she described herself as able to follow instructions and that she was eager to learn new skills. (*Id*.) The ALJ thus concluded that Plaintiff was able to perform simple routine tasks with few detailed instructions with changes were introduced slowly and well explained; she could follow simple instructions delivered orally; she could perform work where no more than occasional changes in work setting and decision making were required; and that she could perform goal-based work with no production rate pace work, high or strict production quotas, and piece rate work. (R. at 29.) The hypothetical posed by the ALJ to the VE who testified on July 5, 2018, adequately incorporated all these limitations that the ALJ had credited. (R. at 73–74.) Accordingly, the ALJ did not commit reversible error when she relied upon that testimony.

For these reasons, the undersigned does not conclude that the ALJ committed reversible error when she relied upon testimony from the VE who testified on July 5, 2018.

## VI.     RECOMMENDED DISPOSITION

In sum, from a review of the record as a whole, the undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. For all the foregoing reasons,

24

it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors

and **AFFIRM** the Commissioner of Social Security's decision.

## VII.    PROCEDURE ON OBJECTIONS

If any party objects to this R&R, that party may, within fourteen (14) days of the date of

this R&R, file and serve on all parties written objections to those specific proposed findings or

recommendations to which objection is made, together with supporting authority for the

objection(s).  A Judge of this Court shall make a *de novo* determination of those portions of the

R&R or specified proposed findings or recommendations to which objection is made.  Upon

proper objections, a Judge of this Court may accept, reject, or modify, in whole or in part, the

findings or recommendations made herein, may receive further evidence or may recommit this

matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the R&R will result in a

waiver of the right to have the District Judge review the R&R *de novo*, and also operates as a

waiver of the right to appeal the decision of the District Court adopting the R&R.  *See Thomas v.*

*Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


/s/ *Chelsey M. Vascura*___
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE